OPINION OF THE COURT
Michael D. Stallman, J.
In this employment discrimination action, plaintiff, Raouf Hanna, M.D., an Egyptian-American doctor, alleges discrimination and retaliation by defendant New York Hotel Trades Council and Hotel Association of New York City Health Center, Inc. from June 23, 1997 through December 17, 2002. Defendant moves for summary judgment.
Background
Hanna alleges that Rick Walquist, D.O., medical director for the Health Center, hired him in 1997 to work in the urgent care area. Hanna claims that the Health Center consistently discriminated against him by: denying promotion; denying privileges; denying pay increases; forcing him to work longer hours; harassing, demeaning and chastising him; and subjecting him to a hostile work environment due solely to his Egyptian national origin. The complaint also alleges that when Hanna complained of the discrimination, the Health Center allegedly retaliated by subjecting him to further discriminatory practices. Hanna resigned effective January 3, 2003.
Hanna asserts two causes of action against the Health Center under title 8 of the Administrative Code of the City of New York (New York City Human Rights Law, or, herein, NYCHRL): (i) national origin discrimination (first cause of action, under section 8-107 [1] [a]); and (ii) retaliation (second cause of action, under section 8-107 [7]).
The Health Center moves for summary judgment pursuant to CPLR 3212 dismissing the complaint in its entirety on the ground that it fails to state a claim for which relief may be granted.
I
National Origin Discrimination (First Cause of Action)
Analysis of employment discrimination matters in New York mirrors the burden-shifting rubric established by the United States Supreme Court in McDonnell Douglas Corp. v Green *438 (411 US 792 [1973]).[1] Thus, Hanna has the initial burden to establish a prima facie case of discrimination. To meet this burden, he must show that: (i) he is a member of a protected class; (ii) he was qualified to hold his position; (iii) he was terminated from employment or suffered another adverse employment action; and (iv) the discharge or other adverse action occurred under circumstances giving rise to an inference of national origin discrimination. (Id.; see also Forrest v Jewish Guild for the Blind, 3 NY3d 295, 305 [2004].)
To conclusively demonstrate its entitlement to judgment as a matter of law, the Health Center must show that Hanna does not have a prima facie case, or, failing that, the Health Center must offer a nondiscriminatory reason for the alleged adverse action. The burden would then shift back to Hanna to defeat the motion for summary judgment by showing that there is a material issue of fact (i) as to whether the Health Center’s asserted reason for the alleged national origin discrimination is false or unworthy of belief, and (ii) that it is more likely than not that Hanna’s national origin was the real reason for the discrimination. (See e.g. Criley v Delta Air Lines, Inc., 119 F3d 102, 104 [2d Cir 1997], cert denied 522 US 1028 [1997]; Gallo v Prudential Residential Servs., Ltd. Partnership, 22 F3d 1219, 1225 [2d Cir 1994].)
*439 Hanna asserts, and, for the purposes of this motion, the Health Center concedes, that he is a member of a protected class, and that he was qualified to hold his position at the Health Center. (See McDonnell Douglas Corp., 411 US at 802.) However, the Health Center contends that Hanna resigned (that is, he was not terminated), and, in any event, suffered no adverse employment action. Moreover, the Health Center argues, there is no inference of national origin discrimination available from the analysis of the circumstances. Hanna counters that he was “constructively” terminated, claims to have been subjected to a hostile work environment, and contends that there are factual indications that national origin discrimination was the reason for the hostile work environment that forced his resignation.
Constructive Discharge
Hanna, whose testimony enjoys every favorable inference on this motion (City of New York v Patrolmen’s Benevolent Assn. of City of N.Y., 27 NY2d 410, 415 [1971]), has testified that, around October 25, 2002, he was summoned to Dr. Walquist’s office and given a piece of paper. Walquist then allegedly said, “Here, I want you to write this down: ‘Thank you, Dr. Walquist, for the years I served you at the Health Center.’ And then don’t come in tomorrow.” Hanna testified that, after he refused to comply with Walquist’s request, Walquist went on to say, “otherwise, if you don’t do that, I’ll put you under the gun. You come late one minute, I will fire you.”
These statements, even if truly uttered, would not amount to constructive termination. (Compare Spence v Maryland Cas. Co., 995 F2d 1147, 1150 [2d Cir 1993] [statement “I will come up and fire you, Spence, and every other member of your management team that’s in this room. Starting with you” insufficient to show constructive discharge]; Stetson v NYNEX Serv. Co., 995 F2d 355, 360 [2d Cir 1993] [dissatisfaction with assignments and unfair criticism insufficient to establish constructive discharge]; O’Dell v Trans World Entertainment Corp., 153 F Supp 2d 378, 393 [SD NY 2001], affd 40 Fed Appx 628 [2d Cir 2002] [same]; Katz v Beth Israel Med. Ctr., 2001 WL 11064, *12-14, 2001 US Dist LEXIS 29, *33-44 [SD NY, Jan. 4, 2001] [being told to retire, unfairly disciplined, yelled at by supervisors, and threatened with termination does not constitute constructive discharge].)
The record shows that Hanna was warned many times about his lateness. Indeed, a letter dated approximately the same time as the reported conversation states that “[fjuture [lateness] will *440 lead to immediate termination.” (Notice of motion, exhibit S.) Nothing in the law prevents an employer from threatening to discharge, or, indeed, discharging, an employee who is chronically late.
Hanna’s contention that he was more severely treated for his lateness than other employees is unavailing. The Health Center has submitted numerous memos to other doctors advising them of lateness problems, and threatening termination. (See Walquist affidavit, exhibit T.) Apparently, this method of discipline was general and frequent; it was not uniquely directed to Hanna.
Moreover, it was Walquist who hired Hanna in the first place. This gives rise to an inference that discrimination was not his motivation for the alleged constructive termination. (Carlton v Mystic Transp., Inc., 202 F3d 129, 137 [2d Cir 2000], cert denied 530 US 1261 [2000] [“(w)hen the same actor hires a person already within the protected class, and then later fires that same person, ‘it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire’ ” (citation omitted)].) Hanna’s allegations of constructive discharge are insufficient to withstand a motion for summary judgment.
Adverse Employment Action
Hanna’s allegations also do not rise to the level of adverse employment action. Specifically, Hanna claims that Walquist: (i) told him that his “medicine was wrong”; (ii) made fun of his accent; (iii) forced him to work extended hours; (iv) foisted an inordinate number of medical clearances upon him to perform; and (v) failed to give him a pay raise that was given to all other employees. In addition, Hanna claims that he was forced to remain in the urgent care area of the Health Center and watch less experienced doctors be given opportunities to work as panel physicians. Hanna maintains that this refusal to promote was also an adverse employment action.
These alleged acts do not constitute adverse employment action. Walquist’s statement that Hanna’s “medicine was wrong” expresses a difference of opinion; it is not an adverse employment action. Neither is assignment of a physician to work extended hours, for which he was paid, adverse. Many workers would welcome the opportunity to increase their incomes by working overtime. Given patient needs, a physician’s employer may reasonably have the discretion to assign staff as required; assignment to extended hours alone does not set forth an adverse employment action. Neither has Hanna shown that performing medical clearances was a demotion in any way.
*441 Although making fun of an employee’s accent is offensive and inappropriate, it does not constitute an adverse employment action. (See Forrest, 3 NY3d at 307 [“snatching of a pad from her hands, the patting of a seat in an allegedly humiliating way, the shouting at her in a meeting, the circling of her name on a time sheet, the rolling of eyes when she spoke (did not constitute) a materially adverse change in the terms and conditions of plaintiffs employment”].)
Hanna also alleges that Walquist failed to give him a pay raise that was given to all other doctors. According to the unrefuted evidence, Hanna was hired at a rate of $65 per hour, while all other doctors at the Health Center were then paid $60 per hour. Hanna submits evidence that, on June 25, 2001, all doctors were given a raise to $65 per hour, while he received no increase. Thus, Hanna seeks recovery because the Health Center paid him at the same hourly rate as other doctors.
This resulting pay rate equality does not give rise to any inference of discrimination for at least three reasons. First, plaintiff offers no support for the novel contention that receiving the same pay as coworkers is discriminatory. There is no proffered basis for any pay differential (indeed, plaintiff initially benefit-ted from a pay differential), and no basis for this court to hold that equal wage rates constitute actionable discrimination. Rather, wage discrimination ordinarily requires proof of unequal treatment. (See Belfi v Prendergast, 191 F3d 129, 139 [2d Cir 1999] [prima facie title VII claim for unequal pay requires showing that plaintiff is a member of a protected class, and was paid less than nonmembers of the class for work requiring substantially the same responsibility]; see also Tomka v Seiler Corp., 66 F3d 1295, 1312 [2d Cir 1995] [“(a) claim of unequal pay for equal work under Title VII and the HRL is generally analyzed under the same standards used in an (Equal Pay Act [EPA]) claim” (citation omitted)[2]].)
Moreover, under the Age Discrimination in Employment Act (29 USC § 621 et seq.) — an analogous statute — recovery may be sought only for lost wages, fringe benefits, and punitive damages for a wilful violation, and not for expected-pay damages (see 29 USC § 626). As Hanna has not alleged unequal pay, because Hanna seeks damages other than lost wages, lost fringe *442 benefits, plus an equal amount in liquidated damages, the claims should be dismissed. (See Kovalesky v A.M.C. Associated Merchandising Corp., 551 F Supp 544, 549 [SD NY 1982].)
Second, by way of comparison, “[i]n addition to the requirements that are generally the same as those under the EPA, a Title VII plaintiff must also produce evidence of discriminatory animus in order to make out a prima facie case of intentional sex-based salary discrimination.” (Belfi, 191 F3d at 139 [internal quotation marks omitted].) Here, the inference of discriminatory animus is defeated by Hanna’s own affirmation. Hanna has denied that he ever asked to be paid more than other doctors, and has sworn that when he was hired, “Walquist told me that he would get me an extra $5/hour for me, so that I would be compensated at $65/hour.” (Hanna affidavit ¶ 18.) Accepting the veracity of this statement, and noting the resulting pay differential in Hanna’s favor, it would be improper to impute an invidious motivation to Walquist with regard to subsequent pay rate decisions. (Compare Carlton, 202 F3d at 137.)
Finally, given the unrefuted evidence that every other doctor at the Health Center was paid at the same lower rate ($60 per hour), and that, after the June 25, 2001 adjustment, all physicians (including Hanna) were paid at the same rate ($65 per hour), a rational factfinder could only conclude that the decision to pay Hanna at the same rate was not motivated by discrimination. (Compare Lapsley v Columbia University-Coll. of Physicians & Surgeons, 999 F Supp 506, 517 [SD NY 1998].)
An adverse employment action is no less than a materially adverse change in the terms and conditions of employment. Such change must be
“more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.” (Galabya v New York City Bd. of Educ., 202 F3d 636, 640 [2d Cir 2000] [citations and internal quotation marks omitted]; accord Kassner v 2nd Ave. Delicatessen Inc., 496 F3d 229, 238 [2d Cir 2007] [applying the Galabya definition of adverse employment action to NYCHRL despite passage of Local Law 85 § 1 (which called for more *443 stringent application of human rights standards) in 2005].)
It is well established that less severe actions, such as refusal to promote, may also be deemed an adverse employment action. (Phillips v Bowen, 278 F3d 103, 109 [2d Cir 2002]; see also Treglia v Town of Manlius, 313 F3d 713, 720 [2d Cir 2002] [“claim of discriminatory failure to promote falls within the core activities encompassed by the term ‘adverse actions’ ” (citation omitted)].) However, the Health Center has submitted unrefuted evidence that the positions of panel physician and urgent care physician are on an equal level, and that becoming a panel physician is not a promotion at all. In support of this contention, the Health Center has submitted evidence that the salaries, the hours, the title, and the benefits for each position are exactly the same.
Relying upon Dash v Equitable Life Assur. Socy. of U.S. (753 F Supp 1062, 1067 [ED NY 1990]), Hanna argues that whether a change from urgent care physician to one of panel physician is a promotion is a question of fact. This narrow reading of Dash is inappropriate, for two reasons.
First, Dash was an action based upon the right to make contracts (as implicated under 42 USC § 1981), and not upon title VII actions. (See Dash at 1066.) Second, Dash established that it is “[o]nly where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981.” (Id. at 1067 [citation and internal quotation marks omitted].) Walquist has affirmed, and it has not been refuted, that he served as the supervisor for both the urgent care and the panel physician areas. This gives rise to the inference that moving from one area to the other would not create a new and distinct relationship between Hanna and Walquist, or Hanna and the Health Center’s administrative structure. (See Galabya, 202 F3d at 640.) Hanna has not demonstrated otherwise or shown that a triable question exists.
Accepting all of Hanna’s allegations as true, adverse employment action has not been sufficiently shown to withstand a motion for summary judgment.
Hostile Work Environment
Hanna’s complaint also fails to demonstrate that a hostile work environment was created. Although reluctant to grant summary judgment in such matters, “[c]ourts use a ‘totality of the circumstances’ approach for determining whether a *444 plaintiffs work environment is sufficiently hostile to support a hostile work environment claim.” (Love v City of N.Y. Dept. of Consumer Affairs, 390 F Supp 2d 362, 371 [SD NY 2005] [citation omitted].) In making such a determination, courts consider the alleged conduct’s frequency, severity, physically threatening or humiliating nature, and interference with the plaintiffs work performance. (Id., citing Brennan v Metropolitan Opera Assn., Inc., 192 F3d 310, 319 [2d Cir 1999].)
Here, the allegations do not sufficiently set forth a claim for hostile work environment for two reasons. First, although making fun of an employee’s accent is offensive and inappropriate, and may cause a decidedly unpleasant work environment, Hanna has claimed only occasional incidents and remarks and has not cited specifics as to the manner, frequency or context of the alleged conduct. (See Quinn v Green Tree Credit Corp., 159 F3d 759, 768 [2d Cir 1998] [“ ‘isolated remarks or occasional episodes of harassment will not merit relief under Title VII’ ” (citation omitted)]; Spence v Maryland Cas. Co., 995 F2d 1147, 1155 [2d Cir 1993] [“stray remarks uttered in the workplace . . . insufficient to create a material issue of fact to defeat a summary judgment motion”]; Carrero v New York City Hous. Auth., 890 F2d 569, 577 [2d Cir 1989] [incidents “must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive” (citation omitted)]; Bellom v Neiman Marcus Group, Inc., 975 F Supp 527, 532 [SD NY 1997] [mimicking of accent on one or two occasions insufficient to establish national origin discrimination].)
Second, courts allow national origin discrimination claims based upon mimicry to stand alone only if such actions were severe or pervasive. For example, where a defendant’s employee constantly used a “weird Spanish accent” when talking to Hispanic people, and on an occasion described Hispanics as being “very greasy,” a court found that the “comments, standing alone, were not so severe that they could alter the conditions of [plaintiff’s] employment. However, when combined with the display of Klu Klux Klan robes and/or [a] noose, these incidents may constitute an objectively hostile environment.” (Little v National Broadcasting Co., Inc., 210 F Supp 2d 330, 390 [SD NY 2002] [emphasis added]; see also Zhao v State Univ. of N.Y., 472 F Supp 2d 289, 312-313 [ED NY 2007] [mimicking plaintiffs accent, comparing Turkish people to Chinese people, and suggesting that a Chinese babysitter bring her husband to help out, insufficiently “severe or pervasive to establish a hostile work *445 environment under well-settled Second Circuit case authority”]; Abidekun v New York City Tr. Auth., 1998 WL 296372, *6, 1998 US Dist LEXIS 8290, *18-21 [ED NY 1998] [calling plaintiff a foreigner and making reference to his accent, without more, does not give rise to a claim of hostile work environment harassment].)
This court is cognizant that “discrimination is rarely so obvious or its practices so overt that recognition of it is instant and conclusive, it being accomplished usually by devious and subtle means.” (300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d 176, 183 [1978].) Here, nonetheless, as defendants have demonstrated the absence of a prima facie case for national origin discrimination, summary judgment dismissing the first cause of action is required. (Forrest, 3 NY3d at 305 [“(t)o prevail on their summary judgment motion, defendants (may demonstrate) plaintiff's failure to establish every element of intentional discrimination”]; Ioele v Alden Press, 145 AD2d 29, 34-36 [1st Dept 1989]; see also Norton v Sam’s Club, 145 F3d 114, 119 [2d Cir 1998], cert denied 525 US 1001 [1998] [overturning jury’s verdict due to very weak prima facie case]; Sedor v Frank, 42 F3d 741, 746 [2d Cir 1994], cert denied 515 US 1123 [1995] [“(i)f proof of any of the four elements (of the prima facie case) is lacking, the claim must fail”]; Winiarski v Connecticut Dept. of Pub. Health, 273 F Supp 2d 189, 192 [D Conn 2003] [summary judgment granted where plaintiffs prima facie case is weak and defendant’s explanation that no discrimination occurred is supported by substantial evidence]; accord Kemer v Johnson, 900 F Supp 677, 686 [SD NY 1995], affd 101 F3d 683 [2d Cir 1996], cert denied 519 US 985 [1996].)
Retaliation (Second Cause of Action)
It is well established that “a claim for retaliatory conduct does not necessarily fail by reason of a subsequent finding that the underlying discrimination complaint, upon which the claim of retaliation is premised, is without merit.” (Modiano v Elliman, 262 AD2d 223 [1st Dept 1999].)
The showing required to make out a prima facie case of retaliation is similar to that necessary to make out a prima facie case of discrimination: retaliation claims are also analyzed under the burden-shifting framework established in McDonnell Douglas Corp. (Jetter v Knothe Corp., 324 F3d 73, 75-76 [2d Cir 2003].) To establish retaliation, a plaintiff has the initial burden of showing: (i) participation in a protected activity; (ii) that the defendant knew of the protected activity; (iii) adverse employment *446 action; and (iv) a causal connection between the protected activity and the adverse employment action. (Dooner v Keefe, Bruyette & Woods, Inc., 157 F Supp 2d 265, 284 [SD NY 2001].)
Here, however, as shown above, Hanna has failed to demonstrate any adverse employment action. (See International Healthcare Exch., Inc. v Global Healthcare Exch., LLC, 470 F Supp 2d 345, 357 [SD NY 2007] [claims under NYCHRL require showing that plaintiff engaged in a protected activity that caused defendants to instigate an adverse employment action].) Because adverse employment action is an element of a retaliation claim, plaintiff cannot show retaliation as a matter of law. As a result, summary judgment dismissing the second cause of action for retaliation is also granted.
Finally, the complaint makes no allegation with regard to defendants Doe Corporations 1-5 except that “they were connected in some manner with the Health Center.” The complaint has, thus, also failed to state any cause of action against those defendants.
Conclusion
Accordingly, it is hereby ordered that the motion of defendant, New York Hotel Trades Council and Hotel Association of New York City Health Center, Inc. to dismiss the complaint is granted and the complaint is dismissed.

. The court notes New York City Council policy that NYCHRL is to be liberally and independently construed with the aim of making it more protective than its federal (Civil Rights Act of 1964 tit VII [42 USC § 2000e et seq.]) or state (Executive Law § 290 et seq.) counterparts. Hence, case law suggests that the other human rights laws “should merely serve as a base for the [NYCHRL], not its ceiling.” (Farrugia v North Shore Univ. Hosp., 13 Misc 3d 740, 747 [Sup Ct, NY County 2006]; Jordan v Bates Adv. Holdings, Inc., 11 Misc 3d 764, 771 [Sup Ct, NY County 2006]; see also Local Law No. 85 [2005] of City of NY § 1 [Local Civil Rights Restoration Act of 2005].) Nonetheless, as the NYCHRL and federal title VII address the same type of discrimination, are textually similar, and employ the same standards of recovery, New York courts have attempted, and continue to attempt, to resolve federal, state, and city employment discrimination claims consistently with McDonnell Douglas Corp. (See Matter of Aurecchione v New York State Div. of Human Rights, 98 NY2d 21, 25-26 [2002]; Ferrante v American Lung Assn., 90 NY2d 623, 629 [1997]; Shah v Wilco Sys., Inc., 27 AD3d 169, 177-178 [1st Dept 2005]; see also Garone v United Parcel Serv., Inc., 436 F Supp 2d 448, 473 [ED NY 2006] [maintaining in 2006, after passage of Local Law 85 § 1 in 2005, that NYCHRL claims are to be analyzed identically to claims under the Age Discrimination in Employment Act and title VII); Almonord v Kingsbrook Jewish Med. Ctr., 2007 WL 2324961, *7, 2007 US Dist LEXIS 58529, *19 [ED NY, Aug. 10, 2007] [“(a)s a general matter, employment discrimination claims brought (under NYCHRL) are evaluated under the standards that apply to Title VII cases”].)

. The EPA (29 USC § 206 [d] [1]) bans sex discrimination, and provides that “[n]o employer . . . shall discriminate ... by paying wages to employees ... at a rate less than the rate at which he pays wages to employees of the opposite sex . . . .”